FRANCIS A. WITT, PLAINTIFF-RESPONDENT, v. GLOUCESTER COUNTY BOARD OF CHOSEN FREEHOLDERS, DEFENDANT-RESPONDENT, AND SHIRLEY ROGERS, ROBERT BUTLER, JOHN BURZICHELLI AND JOHN HUNT, DEFENDANTS-COUNTERCLAIMANTS AND THIRD PARTY PLAINTIFFS-AP-PELLANTS, v. GLOUCESTER COUNTY UTILITIES AUTHORI-TY, A BODY POLITIC OF THE STATE OF NEW JERSEY, THIRD PARTY DEFENDANT.

Argued October 12, 1982—Reargued April 19, 1983.
Decided October 6, 1983.

424

*John T. McNeill* argued the cause for appellants (*Moss, Thatcher, Moss, McNeill & Ferreri,* attorneys); *Eugene J. McCaffrey, Jr.,* on the brief.

*Harold L. Crass* argued the cause for respondent Francis A. Witt (*Herman, Pearson & Crass,* attorneys).

*Andrew Weber,* Assistant County Counsel, argued the cause for respondent Gloucester County Board of Chosen Freeholders (*Russell E. Paul,* Gloucester County Counsel, attorney).

*Mary C. Jacobson,* Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney).

*Frederick G. Stickel, III,* argued the cause for *amicus curiae* New Jersey Institute of Municipal Attorneys (*Frederick G. Stickel, III,* attorney; *Frank Scangarella,* on the letter-brief).

The opinion of the Court was delivered by

POLLOCK, J.

The primary issue concerns the effect of the Open Public Meetings Act, *N.J.S.A.* 10:4–6 to –21, on two resolutions adopted by the Gloucester County Board of Freeholders (the Board) on December 2, 1981. One resolution increased the membership of the Gloucester County Utilities Authority (the Authority) from five to nine members, and the other resolution appointed the four individual defendants to the newly created positions. A second issue involves the validity of a subsequent resolution of the Board adopted on January 13, 1982, reducing the Authority's membership from nine back to five.

The Law Division held both resolutions valid, with the result that the Authority consisted of five members. In an unpublished opinion sustaining that result, the Appellate Division declared invalid the initial resolution increasing the Authority's membership. Accordingly, that court found to be moot the question of the validity of the second resolution reducing the Authority's membership. We reverse. Although the notice for the December 2 meeting complied with the Open Public Meetings Act and the resolution increasing the Authority's membership was valid, the Board lacked power subsequently to reduce the Authority's membership from nine to five members.

I

This matter arises out of a struggle among members of the two political parties on the Board for control of the Authority. In 1968, the Board created the Authority and provided for five commissioners to serve staggered five-year terms. See *N.J.S.A.* 40:14B–4. On subsequent occasions, the Board informally discussed increasing membership of the Authority, but did not increase the membership until December 2, 1981. At various times during the Authority's existence, each party has controlled the Board. The Republican Party controlled the Board immedi-

ately prior to the November 1981 general election, which caused control of the Board to shift to the Democratic Party effective January 1982.

In the interim following the election, the Board held a "work session" or agenda meeting on December 1, 1981 to discuss the agenda for a regularly scheduled meeting on the following day, December 2, 1981. Pursuant to the Board's rules, a copy of the agenda for the December 2, 1981 meeting, including the subject resolutions, was placed on each freeholder's desk. As permitted by *N.J.S.A.* 40:14B–4 b, the first resolution enlarged the membership of the Authority from five to nine members; the second resolution appointed the four individual defendants as the new members.

The record is devoid of any proof of the circumstances surrounding the authorization of the resolutions. Apparently no discovery was made of the Republican members of the Board, and none of those members testified before the trial court. At the December 1, 1981 meeting, however, Democratic members protested the expansion of the Authority and the appointments. At trial, they testified that at no time prior to the December 1 meeting had they known of or discussed the resolutions.

Although the public had the opportunity to discuss the two resolutions at the public portion of the December 2 meeting, the part of the meeting when the resolutions were specifically considered was closed to the public. Nonetheless, the Democratic members questioned the reason for the expansion, which they viewed as "strictly political." According to the minutes, however, Freeholder Kennedy, a Republican member, explained "that times change over the years and responsibilities are added and that major problems and projects are here and must be addressed, and by [sic] expanding the expertise and input from five members to nine, is in keeping with the expanding roll [sic] that the Utilities Authority is facing." The minutes disclose further that Freeholder Fredericks, a Democrat, "responded by stating that the expansion of the Authority may indeed be valid,

but he felt the responsibilities of jobs that are being stated as reasons for expanding, [sic] should be spelled out and made abundantly clear before additional members are added, not after they are added." By a 5–2 vote along partisan lines, the Board adopted the resolutions, thereby increasing the membership from five to nine and appointing the individual defendants as members of the Authority.

In addition to questioning the reasonableness of the increase in Authority membership, the Democratic members also challenge the adequacy of the notice for the December 2, 1981 meeting. At the annual meeting on January 2, 1981, the Board had adopted a resolution establishing a schedule of regular meetings for the year 1981. The schedule included the December 2 meeting, the location of which was changed by later resolution from Woodbury to Newfield. As required by *N.J.S.A.* 10:4–6 to –21, notice of those resolutions indicating the date, time, and location of the December 2 meeting was duly published in the press and posted in the Gloucester County Court House.

The new members of the Authority took their oaths of office on December 3, 1981, and on December 4, plaintiff, Witt, chairman of the Authority and also chairman of the Democratic Party County Committee, filed a complaint in lieu of prerogative writ asserting that the action of the majority was "arbitrary, capricious and in bad faith." Before the trial court, Witt also alleged a violation of the Open Public Meetings Act. The trial court denied Witt's request for a preliminary injunction to prevent the individual defendants from acting as commissioners. On January 13, 1982, the reconstituted Board, then controlled by the Democratic Party, resolved to decrease the Authority's membership to five.

The defendants counterclaimed against the Board and filed a third-party complaint against the Authority. After an expedited trial at which no further oral testimony was taken, the trial court found that neither the December 2 resolutions nor the

January 13 resolution was arbitrary or unreasonable. The court ordered that the four appointees be paid from the date of their appointment through January 13, and dismissed all claims with prejudice. In its oral opinion, the court made no mention of the Open Public Meetings Act or the source of the Board's power to decrease the membership of the Authority.

On appeal, the Appellate Division acknowledged that the record was "somewhat vague." Without referring to any evidence, that court found, nonetheless, "that the majority bloc agreed privately, in advance, on the individuals to be appointed to the four new positions." Based on this finding, the court concluded that the majority violated the Open Public Meetings Act by failing to deliver an agenda including notice of the resolutions forty-eight hours before the December 2 meeting. See *N.J.S.A.* 10:4–8 d. On the assumption that the majority had caucused in advance to obtain agreement on the resolutions, the Appellate Division concluded that the majority had contravened that part of the act prohibiting the omission of an invitation by a public body to "a portion of its members to a meeting for the purpose of circumventing the provisions of this act." *N.J.S.A.* 10:4–11. Because it concluded that the December 2 resolutions were invalid, the Appellate Division found to be moot the question whether the Board had the power to decrease the size of the Authority by enacting the January 13 resolution. We granted certification, 84 *N.J.* 438 (1982), and also granted a partial stay to enable the Authority to conduct its regular business, subject to limitations on its power to make appointments.

## II

The Appellate Division left undisturbed the finding of the trial court that the action of the Board in adding four members to the Authority was not an arbitrary and capricious exercise of its discretionary power. Our independent review of the record leads us to the same conclusion. Legislative action of

municipal and county bodies is presumed valid and will be upheld in the absence of sufficient proof to overcome the presumption. *See Kozesnik v. Montgomery Tp.,* 24 *N.J.* 154, 167 (1957). As Chief Justice Weintraub once wrote, "[t]he court can intervene only when unreasonableness is clearly established." *Kennedy v. City of Newark,* 29 *N.J.* 178, 185 (1959). *Compare id. with Cullum v. Board of Educ. of N. Bergen Tp.,* 15 *N.J.* 285 (1954), *and Grogan v. DeSapio,* 11 *N.J.* 308 (1953) (overturning municipal action where there was detailed proof of the abuse of discretion). Accordingly, the trial court did not abuse its discretion in concluding that the plaintiff failed to establish that the Board was arbitrary and capricious in passing the December 2 resolution.

■ It remains for us to consider the effect of the Open Public Meetings Act on the Board's adoption of these resolutions. The act applies to gatherings of any public body "organized by law" and "collectively empowered as a multi-member voting body to spend public funds or affect persons' rights," provided that the gathering qualifies as a "meeting" under the law and does not fall within any of the law's exceptions. *N.J.S.A.* 10:4–7; *see N.J.S.A.* 10:4–8 a, –8 b; –9; *see also N.J.S.A.* 10:4–12 (allowing public body to exclude public from portions of an otherwise open and complying meeting in exceptional circumstances). Except for an emergency, a public body may not hold a meeting unless adequate notice has been given to the public. *See N.J.S.A.* 10:4–9.

■ To be covered by the act's provisions, a gathering "must be open to all the public body's members." *N.J.S.A.* 10:4–7. Further, the members present must intend to discuss or act on "the public body's business," *id.,* defined as "all matters which relate in any way, directly or indirectly, to the performance of the public body's functions or the conduct of its business." *N.J.S.A.* 10:4–8 c. Typical partisan caucus meetings and chance encounters of members of public bodies are neither covered nor intended to be covered by the provisions of this act. *N.J.S.A.*

10:4–7. Unfortunately, nothing on the face of the statute or in its legislative history indicates what is a "typical partisan caucus."

As a result, the act leaves a gap between its mandate that meetings of public bodies be open to the public and its authorization that all or an effective majority of the members of those bodies may meet in a typical partisan caucus. On one side of the gap is the provision that "[n]o person or public body shall fail to invite a portion of its members to a meeting for the purpose of circumventing the provisions of this act." *N.J.S.A.* 10:4–11. On the other side is the exception for a "typical partisan caucus." In an apparent attempt to bridge the gap, the Department of State in its *Guidelines on the Open Public Meetings Law* (1975) explained:

> Since a political caucus is only open to one party and would not be open to *all* the members of the public body, it would not be required to be held in open session. Of course, if all the members of a public body were from one political party, the Law would not allow them to hold closed meetings by simply calling them political caucuses. Nor would the Law allow an effective majority of the members of the public body to use the political caucus mechanism to circumvent the Law's provisions.
>
> Does the Law require that both discussion and voting take place in public? Answer: Yes. [Guidelines on the Open Public Meetings Law 4–5 (1975)].

Nonetheless, discussion of the merits of an issue, including its importance to the party and a proposed party position, is to be expected at a typical partisan caucus. We are acutely aware that the act leaves public officials wandering in a land of shadows between typical partisan caucuses and open public meetings. Preferably, a more precise delineation of the boundaries of those two different gatherings should come from the Legislature, which drew the distinction, not the courts.

■ In addition, drawing the distinction is not essential to the disposition of the case. The record is devoid of any proof that the Republican majority met in a typical partisan caucus or in any other kind of meeting. Simply put, the record does not support the allegation that action taken at a prior meeting led to the predetermined adoption of the December 2 resolutions.

Consequently, we reject the conjecture of the Appellate Division that those resolutions were the product of a private meeting.

■ Furthermore, we disagree with the conclusion of the Appellate Division that a public body that has complied with the annual notice requirements of *N.J.S.A.* 10:4–18 must also comply with the forty-eight-hour notice requirements of *N.J.S.A.* 10:4–8 d. One purpose of the Open Public Meetings Act is to ensure the right of "citizens to have adequate advance notice of and the right to attend all meetings of public bodies at which any business affecting the public is discussed or acted upon in any way . . . ." *N.J.S.A.* 10:4–7. Pursuant to that declaration, the act defines "adequate notice" as "written advance notice of at least 48 hours, giving the time, date, location and, to the extent known, the agenda" of a meeting. *N.J.S.A.* 10:4–8 d. The same section continues, however, by stating that "[w]here annual notice or revisions thereof" in compliance with the pertinent provision of the act, *N.J.S.A.* 10:4–18, "sets forth the location of any meeting, no further notice shall be required for such meeting."

When read together, these sections provide that "notice of at least 48 hours" in compliance with *N.J.S.A.* 10:4–8 d is required only in those situations where the public body has failed to provide annual notice that sets forth the location of the meeting and is otherwise in compliance with *N.J.S.A.* 10:4–18. *See Donato v. Gibson,* 178 *N.J.Super.* 163, 169–70 (App.Div.1981); *LaFronz v. Weehawken Bd. of Educ.,* 164 *N.J.Super.* 5, 7–8 (App.Div.1978), certif. den., 79 *N.J.* 491 (1979); *Crifasi v. Governing Body of Oakland,* 156 *N.J.Super.* 182, 185–88 (App.Div. 1978); *In re Application of the County of Monmouth,* 156 *N.J.Super.* 188, 190 n. 1 (App.Div.), certif. den., 77 *N.J.* 473 (1978); *Houman v. Mayor & Council of Pompton Lakes,* 155 *N.J.Super.* 129, 150 (Law Div.1977); *See also* "Guidelines to the 'Open Public Meeting Law'," 98 *N.J.L.J.* 1081, 1094 (1975) (stating that " '48 hour notice' must be given for all meetings of a public body except those meetings whose date, time and location are listed in the Annual Notice Schedule * * * ").

■ The Appellate Division's failure to differentiate between the notice requirements of *N.J.S.A.* 10:4–8 d and those of *N.J.S.A.* 10:4–18 stems from that court's misperception that the act requires the publication of an agenda for all regularly scheduled public meetings. Publication of an agenda, however, is required only in those instances where no annual notice has been provided in accordance with *N.J.S.A.* 10:4–18. Consequently, the Appellate Division erred by concluding that forty-eight-hour notice in compliance with *N.J.S.A.* 10:4–8 d is required where the annual notice requirements of *N.J.S.A.* 10:4–18 have been satisfied.

III

■ We next consider the validity of the January 13 resolution rescinding the earlier resolutions and decreasing the membership of the Authority from nine to five members. Although the applicable statute, *N.J.S.A.* 40:14B–4,[1] expressly permits the expansion of the Authority from five to nine members, it does not provide for a subsequent reduction in membership. The power to increase members does not necessarily imply a commensurate power to decrease membership. *Cf. Ringwood Solid Waste Management Auth. v. Borough of Ringwood,* 131 *N.J.Super.* 61 (Law Div.1974) (where the Legislature has given a municipality the power to create an authority, but has not

---

[1]The relevant section states:

Any county governing body may provide by resolution or ordinance as appropriate that the county utilities authority created by it shall consist of nine members. The four additional members first appointed pursuant to said resolution or ordinance shall be designated to serve for terms respectively expiring on the first day of the second, third, fourth and fifth Februarys next ensuing after the date of their appointment. On or after January 1 in the year in which expires the term of said additional member first appointed and in every fifth year thereafter, one person shall be appointed as a member of the county utilities authority by said county governing body as a successor to such additional member, to serve for a term commencing on February 1 of such year and expiring on February 1 in the fifth year after such year. [*N.J.S.A.* 40:14B–4 b].

mentioned the power to dissolve it, the municipality may not on its own dissolve the authority).

As former Judge Brennan, now an Associate Justice of the United States Supreme Court, observed in *Beyer v. Township Committee of the Township of Mount Holly,* 6 *N.J.Super.* 409 (Law Div.1949):

> It is true that a grant of power to enact an ordinance usually implies the power to amend, change or repeal the ordinance. [Citations omitted]. But this is generally as to ordinances passed pursuant to a general grant of discretionary or regulatory authority when the power to legislate on the subject imports the power to pass more than one ordinance respecting it. . . .
>
> But the general rule admits of an exception where the amending or repealing ordinance relates to an ordinance enacted under a narrow, limited grant of authority to do a single designated thing in the manner and at the time prescribed by the Legislature. In such case the implication is excluded that the municipal legislative body was given any further jurisdiction over the subject than to do the one act. [*Id.* at 411].

See also 6 E. McQuillin, The Law of Municipal Corporations, § 21.10, p. 193 (3d ed. rev. vol. 1980 & Supp.1982).

■ The statutory scheme for the creation and expansion of a county utilities authority, see *N.J.S.A.* 40:14B–4 a, –4 b, fits neatly within the *Beyer* rule. Our examination discloses that the grant of authority to expand the membership of the utility authority is narrow and encompasses a singular subject matter, the appointment of additional members to a preexisting board. In addition, the grant prescribes the manner in which the power is to be exercised and provides procedures establishing the terms of office of the additional members. The statute is resoundingly silent, however, on any procedure to eliminate already seated members. A legislature that has painstakingly formulated a plan for the increase in board membership cannot be viewed as harboring an unexpressed intention to authorize a decrease in that membership. None of the traditional indicia of legislative intent, including sponsor's statements and committee reports, suggests an implied power to reduce membership of the board. *See Property Owners Ass'n of N. Bergen v. Township of N. Bergen,* 74 *N.J.* 327, 337–38 (1977); *cf. Craster v. Board of*

*Comm'rs of Newark,* 9 *N.J.* 225, 230 (1952) (court should not write in additional qualifications to those established by legislature, where legislature has omitted those in its enactment). We conclude that the reconstituted Board did not have the power to decrease the membership of the Authority from nine to five members and that the January 13, 1982 resolution is invalid.

We reverse the judgment of the Appellate Division and remand the matter to the Law Division for the entry of a judgment consistent with this opinion.

*For reversal*—Chief Justice WILENTZ and Justices CLIF-FORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.

*For affirmance*—None.